United States District Court
Southern District of Texas

**ENTERED**

January 28, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ANDY JONES,                          §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §      CIVIL ACTION NO. H-14-1249
                                     §
CAROLYN W. COLVIN,                   §
ACTING COMMISSIONER OF THE           §
SOCIAL SECURITY ADMINISTRATION,      §
                                     §
        Defendant.                   §


<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 18) and Defendant's Cross Motion for Summary Judgment (Doc. 19). The court has considered the motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act").

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 10.

A.  **Medical History**[2]

Plaintiff was born on February 9, 1959, and was fifty-two years old on the date of the alleged onset of disability.[3] Plaintiff had completed the tenth grade and had previously worked as a mover, last working in June 2002.[4] Plaintiff applied for SSI on July 18, 2011.[5] Prior to Plaintiff's alleged onset date, he had a history of cataracts, depression, diabetes mellitus ("diabetes"), hyperglycemia, hypertension, hip degenerative disease, and kidney stones.

  1.  **Physical Impairments**

On August 9, 2011, Plaintiff visited Gulfgate Community Health Center ("Gulfgate") for a follow-up relating to his diabetes.[6] Plaintiff visited general practitioner Thomas Masciangelo, M.D., ("Dr. Masciangelo") reporting numbness and tingling in both feet persisting for several months.[7] Dr. Masciangelo observed that Plaintiff was "doing well" on his current diabetes medication and

---

[2]      Prior to the current application, Plaintiff had previously received an unfavorable disability decision from an ALJ.  See Tr. of the Admin. Proceedings ("Tr.") 31, 108.  Plaintiff's attorney noted at the hearing that Plaintiff's amended administrative onset date was July 18, 2011, the date of Plaintiff's current application.  See Tr. 31; 99.

[3]      See Tr. 108.

[4]      See Tr. 100, 112-13.

[5]      See Tr. 99.

[6]      See Tr. 673.

[7]      See id.

prescribed gabapentin to treat Plaintiff's tingling and numbness.[8]

On September 13, 2011, Plaintiff visited George Conklin, M.D., ("Dr. Conklin") on behalf of disability determination services.[9] Plaintiff's chief complaints was vision loss due to cataracts.[10] He also complained of foot-tingling, shortness of breath, and urination pain.[11]  Dr. Conklin's physical examination noted that Plaintiff appeared to have normal reflexes and leg strength with no disorganization of motor function, but that his near vision was 20/200 and his far vision was 20/100.[12]

On October 17, 2011, Plaintiff returned to Gulfgate where he was evaluated by Dr. Masciangelo regarding diabetes treatment.[13] Dr. Masciangelo observed that Plaintiff was "doing well" managing diabetes, but that he continued to report shortness of breath, which Dr. Masciangelo opined was "likely secondary to deconditioning."[14]

On December 2, 2011, a doctor at Gulfgate, presumably Dr.

---

[8]     See Tr. 679.

[9]     See Tr. 606.

[10]    See id.

[11]    See id.

[12]    See Tr. 606-07.

[13]    See Tr. 640.

[14]    See id.

Masciangelo, completed a physical medical source statement.[15]  The
form indicated that Plaintiff could lift less than ten pounds,
could stand less than two hours and sit less than six hours in an
eight-hour-workday.[16]  A handwritten note stated that Plaintiff was
limited due to "loss of strength and fine manipulation with reduced
endurance and ambulatory capacity."[17]  Another note explained that
due to diabetes, neuropathy, and arthritic pain, Plaintiff would be
unable to sustain any gainful employment.[18]  The note stated that
Plaintiff lacked the ability to fully concentrate due to chronic
illness.[19]

On December 27, 2011, Plaintiff was referred from urology to
Jonathan Chin, M.D., complaining of chest pain that had become more
progressively frequent, with an episode that morning that had been
consistent for several hours.[20]  Plaintiff described the pain as
pressure-like, radiating to his left arm, and that he experienced
associated dizziness and palpitations.[21]  Plaintiff was checked into

---

[15]   See Tr. 1074-78.  The ALJ could not decipher the signature of the
form, but it appears to be prepared by Dr. Masciangelo.

[16]   See Tr. 1075-76.

[17]   See Tr. 1076.

[18]   See id.

[19]   See Tr. 1077.

[20]   See Tr. 1140.

[21]   See Tr. 1134.

4

Ben Taub General Hospital ("Ben Taub") for evaluation.[22]  Plaintiff
was diagnosed with gastroesophageal reflux disease ("GERD") and
discharged without incident.[23]

On January 20, 2012, Plaintiff again visited Dr. Masciangelo.[24]
Dr. Masciangelo determined that Plaintiff's diabetes had worsened
and that he would need to begin taking insulin.[25]  Dr. Masciangelo
further noted that Plaintiff was dealing with joint and back pain
and neuropathy in part due to refusing to take insulin for several
years.[26]

On February 17, 2012, Plaintiff was evaluated by Jocelyn A.
Thomas, M.D., ("Dr. Thomas") for diabetes.[27]  Plaintiff denied
secondary complaints of acute vision changes, numbness, or other
symptoms, but admitted that he did not always follow his diet or
take his medication as prescribed.[28]  Dr. Thomas recommended
nutrition referral and diet compliance, and noted that Plaintiff
was unaware of his current insulin dosage.[29]

On March 15, 2012, Plaintiff returned to Dr. Thomas for

---

[22]    See id.

[23]    See Tr. 1106.

[24]    See Tr. 1213.

[25]    See Tr. 1214.

[26]    See id.

[27]    See Tr. 1203.

[28]    See Tr. 1204.

[29]    See Tr. 1206.

diabetes evaluation.[30]  Plaintiff reported no change in his diet or medication compliance, and complained of hypoglycemia and hypoglycemic symptoms after lunch and dinner.[31]  Plaintiff again denied any diabetes-related side-effects, including numbness, vision changes or neuropathy.[32]  Dr. Thomas noted that Plaintiff did not meet his blood sugar goals and recommended lifestyle modification and medication changes.[33]

On April 5, 2012, Plaintiff visited Rossie J. Gomez, D.P.M., ("Dr. Gomez") a podiatrist at Gulfgate, for foot-care related to diabetes.[34]  Plaintiff reported to Dr. Gomez that he experienced pain along the ball of his right foot, but that he was unable to afford insoles.[35]

On April 25, 2012, Plaintiff visited Dr. Masciangelo at Gulfgate, where he complained of abdominal pain related to kidney stones.[36]  Dr. Masciangelo noted that Plaintiff was meeting his blood sugar goals.[37]  Dr. Masciangelo prescribed hydrocodone to

---

[30]     See Tr. 1189.

[31]     See Tr. 1191.

[32]     See id.

[33]     See id.

[34]     See Tr. 1259.

[35]     See Tr. 1262.

[36]     See Tr. 1246.

[37]     See Tr. 1254.

treat Plaintiff's abdominal and lower back pain.[38]  No side-effects related to diabetes were observed or reported.[39]

On July 16, 2012, Plaintiff again visited Dr. Masciangelo.[40] Dr. Masciangelo noted that Plaintiff's glucose was within an acceptable range, and that his hyperlipidemia was well-controlled following a change in diet and exercise regimen.[41]  Plaintiff was provided a re-fill of pain medication to treat lower back pain.[42]

On September 6, 2012, Plaintiff returned to Dr. Gomez for diabetic foot care.[43]  Plaintiff again reported pain in his right foot, but stated that he was unable to afford insoles or new shoes.[44]  Dr. Gomez observed that Plaintiff's nails were thick and discolored and prescribed an anti-fungal medication.[45]

On September 18, 2012, Plaintiff returned to Ben Taub for a kidney stone removal.[46]  The procedure was completed without incident.[47]

---

[38]   See Tr. 1253.

[39]   See Tr. 1252.

[40]   See Tr. 1471.

[41]   See Tr. 1473.

[42]   See id.

[43]   See Tr. 1447.

[44]   See id.

[45]   See id.

[46]   See Tr. 1295.

[47]   See Tr. 1295-96.

## 2.  Mental Impairments

Over the same period, Plaintiff received regular counseling and psychotherapy.  Plaintiff regularly received counseling from Cynthia Conner, LCSW, ("Conner") regarding depressive disorder.[48]

On September 20, 2011, Plaintiff first met Ashley H. Gilchrist, M.D., ("Dr. Gilchrist") as a referral from Conner.[49] Plaintiff reported he experienced recurring nightmares three times per week and that movement in his sleep had caused him to hit his girlfriend.[50] Plaintiff reported that he had previously been in fights and had been shot at and hit with the butt of a gun in the past, and Dr. Gilchrist noted that Plaintiff admitted to hypervigilance and an exaggerated startle reflex.[51] Plaintiff reported decreased energy and problems with concentration, but no thoughts of mania or suicidal ideation.[52] Plaintiff reported that he previously drank "a bunch," but now drank only drank "about six beers" one night per week, although he occasionally drank whiskey.[53] Dr. Gilchrist noted that Plaintiff had some symptoms of post-traumatic stress disorder ("PTSD") but did not meet the full

---

[48]   See Tr. 645, 684, 1103, 1197, 1245, 1258, 1460, 1600.

[49]   See Tr. 1272.

[50]   See id.

[51]   See id.

[52]   See id.

[53]   See Tr. 1273.

criteria, although he did meet the criteria for major depressive disorder.[54] Dr. Gilchrist increased Plaintiff's Zoloft prescription and scheduled a followup appointment in six weeks.[55]

Plaintiff returned to Dr. Gilchrist on November 15, 2011.[56] Plaintiff reported that he continued to experience nightmares and that he fell out of bed during a nightmare two weeks earlier.[57] Plaintiff described his mood as "okay" and reported low energy.[58]

Plaintiff met with Dr. Gilchrist on December 20, 2011.[59] He reported that he was "about the same," although he stated he was experiencing nightmares only two nights per week.[60] Plaintiff admitted to using alcohol "every now and then," but did not elaborate.[61] He continued to report low energy and difficulty sleeping.[62] Dr. Gilchrist discontinued Zoloft and prescribed fluoxetine (Prozac) for depression and PTSD symptoms and trazodone for insomnia.[63]

---

[54]   See id.

[55]   See id.

[56]   See Tr. 1022.

[57]   See id.

[58]   See id.

[59]   See Tr. 1147.

[60]   See id.

[61]   See id.

[62]   See id.

[63]   See Tr. 1150.

9

Plaintiff returned to Dr. Gilchrist for a psychotherapy session on February 9, 2012.[64] Plaintiff reported that he was still depressed and felt "bad," but that he believed his nightmares were improving.[65] Although he denied any suicidal ideation, he did state that he sometimes wondered, "What's the point?"[66] Plaintiff's Prozac and trazodone prescriptions were increased.[67]

On April 5, 2012, Plaintiff again met with Dr. Gilchrist.[68] Plaintiff stated that his mood was "real, real down," and that he had difficulty sleeping at night, although he took naps throughout the day.[69] He reported his nightmares were "a little better."[70] Plaintiff stated that he had no side effects and that he had been compliant with his medications.[71] Plaintiff's fluoxetine and trazodone prescriptions were increased.[72]

Plaintiff returned to Dr. Gilchrist on May 17, 2012.[73] Plaintiff reported that while his moods were "up and down," they

---

[64]    See Tr. 1174.

[65]    See id.

[66]    See id.

[67]    See Tr. 1177.

[68]    See Tr. 1408.

[69]    See id.

[70]    See id.

[71]    See id.

[72]    See Tr. 1412.

[73]    See Tr. 1217.

had improved since his previous visit.[74]   Plaintiff reported that
he napped on-and-off for three hours during the day and went to
sleep for the night around midnight.[75]   Plaintiff stated that he
tried to walk to the store once per day but that he easily became
tired.[76]   Plaintiff reported that while he still had nightmares,
they had improved since he started meeting with Dr. Gilchrist.[77]  Dr.
Gilchrist maintained Plaintiff's fluoxetine prescription and noted
that there was "some improvement" at the current prescription
level.[78]

On July 24, 2012, Plaintiff met with Kala Bailey, M.D., ("Dr.
Bailey") for psychotherapy.[79]   Plaintiff reported that his mood was
"not good," and that he said he felt very stressed, although he did
not identify a stressor.[80]   Plaintiff reported that his sister had
recently died and that he had drinking more following her death.[81]
Plaintiff admitted that he experienced alcohol cravings when he was
not drinking.[82]   Dr. Bailey opined that Plaintiff's increased

---

[74]   See id.

[75]   See id.

[76]   See id.

[77]   See id.

[78]   See Tr. 1220.

[79]   See Tr. 1391.

[80]   See id.

[81]   See id.

[82]   See id.

11

alcohol intake had a negative affect on his depression and anxiety.[83] Plaintiff stated that he had not been compliant with his medications.[84] Plaintiff's trazodone was discontinued and Plaintiff was instead prescribed Atarax.[85]

On September 4, 2012, Plaintiff again visited Dr. Bailey.[86] Plaintiff reported that he was doing "pretty good," although he had occasional thoughts about his death.[87] Plaintiff stated that he had trouble taking his medications, and Dr. Bailey contacted Plaintiff's girlfriend regarding medication compliance and purchasing a pill organizer.[88] Plaintiff also reported his alcohol use had declined since his previous session.[89]

On October 16, 2012, Plaintiff returned to Dr. Bailey.[90] Plaintiff reported that he was doing "okay" but indicated that he continued to have nightmares.[91] Plaintiff also reported feelings of paranoia.[92] Dr. Bailey contacted Plaintiff's girlfriend, who

---

[83]   See Tr. 1392.

[84]   See id.

[85]   See id.

[86]   See Tr. 1382.

[87]   See id.

[88]   See id.

[89]   See Tr. 1385.

[90]   See Tr. 1365.

[91]   See id.

[92]   See id.

indicated that Plaintiff had improved compliance with medications.[93]
Dr. Bailey increased Plaintiff's trazodone and prazosin dosages to
treat insomnia and nightmares, and prescribed Abilify for treatment
of paranoia.[94]

On November 20, 2012, Plaintiff met with Dr. Bailey for his
scheduled psychotherapy appointment.[95]  Plaintiff stated that he was
doing "pretty good," and that while he had nightmares, they were
occurring with less frequency.[96]  Plaintiff continued to report some
trouble sleeping and continued paranoia.[97]  Plaintiff admitted that
he had not been using the pill organizer Dr. Bailey had
recommended.[98]   Dr. Bailey increased Plaintiff's Abilify and
prazosin dosages and reiterated the importance of medication
compliance.[99]

On January 8, 2013, Plaintiff visited Dr. Bailey.[100]  Plaintiff
reported that his mood had improved and that he was having
nightmares less frequently.[101]   He stated that he did not believe

---

[93]     See id.

[94]     See Tr. 1369.

[95]     See Tr. 1527.

[96]     See id.

[97]     See id.

[98]     See id.

[99]     See Tr. 1531.

[100]    See Tr. 1511.

[101]    See id.

13

Abilify was affecting his paranoid thoughts.[102]  Plaintiff discussed his weight loss goals.[103]  Dr. Bailey discontinued Plaintiff's Abilify because Plaintiff reported it was ineffective and to reduce potential polypharmacy.[104]

## B.  Application to Social Security Administration

Plaintiff protectively re-filed for SSI on July 18, 2011, claiming an inability to work due to diabetes and poor vision.[105]

In a disability report, Plaintiff stated that he was five-feet-nine-inches tall, weighed 225 pounds, and had previous work experience as a mover.[106]  He reported that he last worked in 2002 and lived with his mother.[107]

Plaintiff competed a function report on or about August 11, 2011, outlining his everyday activities.[108]  Plaintiff stated that he was unable to work due to his eyesight, worsening depression, diabetes, and side-effects from medication.[109]

Plaintiff reported that his daily activities included taking

---

[102]    See id.

[103]    See id.

[104]    See Tr. 1514.

[105]    See Tr. 82-88, 111.

[106]    See Tr.

[107]    See Tr. 113.

[108]    See Tr. 119-26.

[109]    See Tr. 119.

his medications, going for a walk, and preparing simple meals.[110] Plaintiff stated that he was able to do laundry, but could not do yard work because of his poor vision.[111]  Plaintiff reported that he did not drive, but that he did go out alone, utilizing public transportation.[112]  Plaintiff stated that he was able to manage money and pay bills without assistance.[113]

Plaintiff stated that his hobbies included watching television, going to sporting events, biking, and walking, but that he was unable to do them due to his health.[114]  Plaintiff reported that he rarely spent time with others, although he did occasionally go to church.[115]  Plaintiff stated that he did not feel like being around other people.[116]

With regard to physical abilities, Plaintiff reported that he could not lift more than ten pounds, that his conditions affected his ability to lift, squat, kneel, bend, stand, walk, see, concentrate, or climb stairs.[117]  Plaintiff indicated that he could walk two blocks, but that he would need to rest fifteen-to-twenty

---

[110]    See Tr. 120-21.

[111]    See Tr. 122.

[112]    See id.

[113]    See id.

[114]    See Tr. 123.

[115]    See id.

[116]    See Tr. 124.

[117]    See id.

minutes before he was able to continue walking.[118] Plaintiff reported that he struggled to read written directions but that he could follow spoken instructions and deal with authority figures without incident.[119] Plaintiff indicated that depression affected his ability to handle stress and that he would find himself crying.[120] Plaintiff indicated that he walked with the assistance of a cane, although he did not have a prescription for it.[121]

On September 14, 2011, a Physical RFC Assessment was completed by Manda Waldrep, M.D. ("Dr. Waldrep").[122] Dr. Waldrep evaluated Plaintiff's diabetes, hip degeneration, and pelvic and thigh pain, and found that he could occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours, and sit for six hours in an eight-workday.[123] Dr. Waldrep opined that Plaintiff could never climb ladders, ropes, or scaffolds, and could only occasionally climb stairs, stoop, kneel, crouch, or crawl, with no manipulative limitations.[124]

Dr. Waldrep additionally noted that Plaintiff's depth

---

[118]   See id.

[119]   See Tr. 124-25.

[120]   See Tr. 125.

[121]   See id.

[122]   See Tr. 622-29.

[123]   See Tr. 623.

[124]   See Tr. 624-25.

perception and near and far acuity were limited by cataracts.[125] Dr. Waldrep opined that Plaintiff would have difficulty with small objects and hazardous environments due to his poor vision.[126]  No other limitations were found, and Dr. Wright stated that Plaintiff's alleged limitations were not fully supported by the medical record.[127]  Dr. Waldrep concluded that Plaintiff's alleged limitations were partially supported by medical and other evidence, and that his symptoms were consistent with the severity of his medical diagnoses and the available evidence.[128]

On September 17, 2011, Matthew Snapp, Ph.D., ("Dr. Snapp") completed a Psychiatric Review Technique on Plaintiff's behalf.[129] Dr. Snapp found that Plaintiff experienced depressive disorder that caused moderate restriction in activities of daily living and social functioning and mild difficulties maintaining concentration, persistence, or pace.[130]  Dr. Snapp noted that Plaintiff was able to provide for himself independently and had a global assessment of functioning ("GAF") score of sixty.[131]  Dr. Snapp concluded that Plaintiff's alleged limitations were supported by the evidence but

---

[125]   See Tr. 625.

[126]   See Tr. 625-26.

[127]   See Tr. 315-16, 319.

[128]   See Tr. 627.

[129]   See Tr. 608-20.

[130]   See Tr. 611, 618

[131]   See Tr. 620.

17

that his overall symptoms would not significantly compromise Plaintiff's ability to work.[132]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[133] Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[134] The ALJ granted Plaintiff's request and conducted a hearing on December 14, 2012.[135]

## C. __Hearing__

Plaintiff and a vocational expert testified at the hearing.[136] Plaintiff was represented by an attorney.[137]

Plaintiff testified that he was fifty-four years old and had completed the eleventh grade, but had never graduated from high school.[138] He further testified that he lived with his mother and that he last worked in 1997 or 1998 as a mover.[139] Plaintiff stated he stopped working because of fatigue and vision problems.[140]

Plaintiff stated that he believed he was unable to work due to

---

[132]    See id.

[133]    See Tr. 49-53, 65-66.

[134]    See Tr. 66-68.

[135]    See Tr. 30-48.

[136]    See id.

[137]    See Tr. 30.

[138]    See id.

[139]    See Tr. 32-33.

[140]    See Tr. 34.

foot-and-back pain related to diabetes, fatigue due to diabetes and as a side effect to his medications, and chest pain.[141]  Plaintiff testified that his pain on an average day was a six on a ten-point scale.[142]  Plaintiff stated that he engaged in very few activities, but that he was able to go to a store four-to-five blocks away, with the help of public transportation.[143]  Plaintiff testified that he spent most of the day going back and forth between sitting, standing, and lying down.[144]

Plaintiff stated that he was able to dress, bathe, and cook for himself.[145]  Plaintiff testified that he did not have a driver's license and did not drive at all due to his poor vision.[146]  He further testified that he would occasionally visit his sister's house.[147]  Plaintiff opined that he could lift up to twenty pounds, but that he quickly became fatigued.[148]

Plaintiff stated that he had problems sleeping related to nightmares.[149]  Plaintiff estimated that he napped five-to-six hours

---

[141]    See id.

[142]    See Tr. 35.

[143]    See Tr. 36.

[144]    See id.

[145]    See Tr 36-37.

[146]    See Tr. 37.

[147]    See Tr. 38.

[148]    See Tr. 40.

[149]    See id.

per day during the day.[150]   When asked about depression symptoms, Plaintiff described feelings of paranoia and stated that it related to his nightmares.[151]   He testified that he did not like being around crowds and that he was presently seeing a psychiatrist.[152] Plaintiff stated that he had considered suicide in the past, but not recently.[153]

Plaintiff testified that he had previously been incarcerated as a teenager for burglary.[154]   Plaintiff stated that he not been in trouble after he was released.[155]

The VE then testified regarding Plaintiff's work history.[156] The VE categorized Plaintiff's work as a mover as very heavy exertion and semi-skilled.[157]   The ALJ asked the VE whether a hypothetical individual limited to carrying twenty pounds occasionally and ten pounds frequently, sitting and standing for six hours each per day, with only occasional crawling, crouching, stooping, kneeling, or climbing stairs and ramps, with additional limitations to reading small print, working in dangerous

---

[150]     See Tr. 39.

[151]     See id.

[152]     See id.

[153]     See id.

[154]     See Tr. 41.

[155]     See Tr. 40-41.

[156]     See Tr. 43.

[157]     See Tr. 46.

environments, and avoiding work environments involving heights, machinery, scaffolding, ropes or ladders would be able to perform Plaintiff's previous work.[158]   The VE testified that the individual could not perform Plaintiff's past relevant work.[159]   However, the VE opined that the individual could work as a cafeteria attendant or garment sorter.[160]   The VE further opined that if the individual required being off-task twenty percent of the workday, that the individual could not sustain employment.[161]

## D.   **Commissioner's Decision**

On February 1, 2013, the ALJ issued an unfavorable decision.[162] The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that he had two severe impairments: (1) left hip degenerative joint disease; and (2) depressive disorder.[163]   The ALJ specifically noted that, although Plaintiff suffered from other conditions, including hyperlipidemia, hypertension, neuropathy, GERD, pelvic and thigh pain, kidney stones, cataracts, PTSD, and diabetes, these conditions did not significantly limit his ability to perform work-related activities

---

[158]   See id.

[159]   See id.

[160]   See Tr. 47.

[161]   See id.

[162]   See Tr. 11-21.

[163]   See Tr. 13.

and thus were not severe impairments.[164]

The ALJ next determined that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any of the listings of the regulations (the "Listings").[165]   In particular, the ALJ first considered whether Plaintiff met or equaled Listing 12.04 (mood disorder).[166]   The ALJ determined that Plaintiff had moderate difficulties in activities of daily living and social functioning, and mild difficulties with concentration, persistence and pace, with no episodes of decompensation of an extended duration.[167]   The ALJ similarly found that Plaintiff met none of the criteria of Paragraph C of Listing 12.04.[168]

In determining Plaintiff's RFC to perform work-related activities, the ALJ found Plaintiff capable of light work with the following limitations: sitting for no more than six hours in a work-day; standing for no more than six hours in a work-day; occasionally crawling, stooping, crouching, and climbing stairs and ramps; no visual acuity requirements; limited use of small objects or small print reading; and no dangerous machinery, unprotected

---

[164]   See Tr. 14.

[165]   See id.  The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

[166]   See Tr. 14-15.

[167]   See id.

[168]   See Tr. 15.

heights, scaffolding, ropes, or ladders.[169]

The ALJ found Plaintiff to be credible, except to the extent that his testimony regarding his limitations was not supported by treating physicians' records.[170]   The ALJ noted that the records reported noncompliance regarding diabetes treatment and that Plaintiff had refused further corrective vision surgery.[171]

In weighing the opinion evidence, the ALJ gave little weight to a form with an unreadable signature completed on December 2, 2011, that stated Plaintiff had reduced endurance and ambulatory capacity, and opined that Plaintiff could not perform work at the sedentary level.[172]   The ALJ similarly provided little weight to a medical source statement completed by Dr. Masciangelo before the relevant period, opining that Plaintiff suffered from weakness and sensory loss, diabetic retinopathy and paresthesias that rendered Plaintiff unable to perform work at any level.[173]   The ALJ explained that he provided little weight to these opinions because they were not supported by the underlying treatment records.[174]

Relying on the VE's testimony, the ALJ found that Plaintiff

---

[169]   See Tr. 16.

[170]   See Tr. 18.

[171]   See id.

[172]   See Tr. 18-19.

[173]   See Tr. 19.

[174]   See id.

23

could not perform any past relevant work.[175]  However, the ALJ found that Plaintiff could perform other jobs in the regional and national economy, including office cleaner, cafeteria attendant, and garment sorter.[176]  Accordingly, the ALJ found that Plaintiff had not been under a disability from July 18, 2011, through the date of her decision.[177]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[178] Plaintiff then timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the

---

[175]    See id.

[176]    See Tr. 20.

[177]    See Tr. 21.

[178]    See Tr. 1-3, 7.

Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under
the applicable legal standard, a claimant is disabled if he is
unable "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment . . .
which has lasted or can be expected to last for a continuous period
of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see
also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The
existence of such a disabling impairment must be demonstrated by
"medically acceptable clinical and laboratory diagnostic" findings.
42 U.S.C. § 423(d)(3); see also 42 U.S.C. § 423(d)(5)(A) Jones v.
Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any
"substantial gainful activity," the regulations provide that
disability claims should be evaluated according to the following
sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that he has
> done in the past must be found "not disabled;" and (5) if
> the claimant is unable to perform her previous work as a
> result of his impairment, then factors such as his age,
> education, past work experience, and [RFC] must be
> considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20
C.F.R. § 404.1520.  The analysis stops at any point in the process

25

upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

A failure to controvert facts by competent summary judgment

26

evidence may lead the court to accept them as undisputed.  <u>See</u> Fed. R. Civ. P. 56(e).   Summary judgment is not awarded by default because a motion is undisputed.   <u>See</u> <u>Ford-Evans v. Smith</u>, 206 F. App'x 332, 334 (5th Cir. 2006); <u>Hetzel v. Bethlehem Steel Corp.</u>, 50 F.3d 360, 362 n. 3 (5th Cir. 1995); <u>John v. State of Louisiana (Board of Trs. for State Colls. and Univs.)</u>, 757 F.2d 698, 708 (5th Cir. 1985).   Summary judgment is appropriate only if the moving parties demonstrate the absence of a genuine issue of material fact and show that judgment is warranted as a matter of law.  <u>See</u> <u>Adams v. Travelers Indem. Co. of Conn.</u>, 465 F.3d 156, 164 (5th Cir. 2006); <u>Hetzel</u>, 50 F.3d at 362 n. 3.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Defendant argues that the decision is legally sound and is supported by substantial evidence.

Plaintiff asserts that the ALJ erred by not incorporating Plaintiff's mental impairments into his RFC finding and by not giving proper weight to Dr. Masciangelo's medical statement.   The court considers each argument in turn.

### A.  <u>Plaintiff's RFC</u>

Plaintiff first argues that the RFC assigned by the ALJ was not supported by substantial evidence.   Plaintiff argues that while the RFC incorporates Plaintiff's non-severe vision problems, the RFC should have included limitations regarding Plaintiff's mental

limitations.

Defendant responds that Plaintiff has conflated several steps of the ALJ's decision: that the ALJ correctly found that mental impairments did not meet a Listing, and then developed an RFC based on Plaintiff's ability to do work.  Defendant argues the ALJ is not obligated to specifically reference findings in steps two and three of the ALJ's decision into steps four and five, so the ALJ's decision was supported by substantial evidence.

Defendant is correct that the ALJ must first consider whether a plaintiff's symptoms, individually or collectively, meet or medically equal a listing.  If a plaintiff's claims do not meet a listing, the ALJ then assesses the plaintiff's RFC based on the work he can do despite physical or mental limitations.  See Perez v. Barnhart, 415 F.3d 457, 461-62 (5th Cir. 2005).

Here, the ALJ first evaluated Plaintiff's depression according to Listing 12.04.  Having found that Plaintiff's depression was not severe enough to meet a Listing, the ALJ again outlined Plaintiff's depression treatment and symptoms as part of a review of relevant medical records in determining Plaintiff's RFC.[179]

Plaintiff cites 20 C.F.R. § 416.945(e) to assert that the ALJ must incorporate limitations accommodating for an impairment. However, 20 C.F.R. § 416.945(e) states only that an ALJ must consider the limiting effects of all impairments, even those found

---

[179]    See Tr. 17.

not to be severe.  Here, the ALJ found Plaintiff's depression to be a severe impairment, and specifically did consider medical records regarding Plaintiff's treatment in formulating Plaintiff's RFC.  In Herring v. Astrue, 788 F. Supp. 2d 513, 519 (N.D. Tex. 2011), the district court found that an ALJ need not specifically include mental limitations into a plaintiff's RFC when there was not evidence that the limitations would affect the plaintiff's ability to work.  Here, the ALJ considered Plaintiff's depression, found that Plaintiff experienced only moderate restrictions, and did not include any mental limitations in Plaintiff's RFC.  The court finds that the ALJ committed no error in making this determination.

**B.  Medical Expert**

Plaintiff also contends that the ALJ failed to give proper weight to the opinion of Dr. Masciangelo.  Plaintiff asserts that Dr. Masciangelo's opinion was entitled to controlling weight and that the ALJ committed reversible error by affording it little weight.

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(internal quotations omitted); see SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996) (explaining the circumstances when medical

opinions by treating physicians are entitled to controlling weight). However, the ALJ ultimately may give less weight to the medical opinion of any physician when the statements are conclusory, unsupported, or otherwise incredible. Greenspan, 38 F.3d at 237. When deciding to do so, the ALJ must indicate the specific reasons for discounting the treating source's medical opinion. See SSR 96-2p.

Here, the ALJ afforded little weight to two medical source statements, one prepared by Dr. Masciangelo outside the relevant period, and one with an unreadable signature apparently prepared by Dr. Masciangelo.[180] Both statements found that Plaintiff was able to function at less than a sedentary level, unable to lift or carry ten pounds, suffered from weakness and sensory loss, and diabetic retinopathy. The source statement with an unreadable signature additionally opined that Plaintiff could not sustain any employment.

The ALJ found both these medical statements to be an overstatement of Plaintiff's functional limitations and not supported by the treatment records. Although the ALJ gave little weight to the two source statements, the ALJ was not required to give any weight to Dr. Masciangelo's statement two months outside of the relevant period. See Slaughter v. Astrue, 857 F. Supp. 2d

---

[180]   Although the ALJ found the signature indecipherable, "Masciangelo" appears on the first page of the medical opinion. See Tr. 1075.

631, 643 (S.D. Tex. 2012) (holding that the ALJ properly disregarded evidence outside the period of disability). Similarly, the ALJ was not required to provide any weight to the opinion that Plaintiff could not perform work at any level, as the ultimate issue of disability is reserved to the Commissioner. See Claiborne v. Astrue, 255 F. App'x 854, 857 (5th Cir. 2007).

The ALJ also found the opinions to be an overstatement of Plaintiff's impairments. The statements opinions concerning Plaintiff's inability to remain sedentary and strength and sensory loss due to diabetes do not appear in any of Plaintiff's treatment records and are not explained in the medical source statement. The ALJ thus properly found that these opinions were entitled to less than controlling weight. See Newton, 209 F.3d at 455-56. The ALJ thus relied on substantial evidence of record and properly adhered to legal procedures in affording Dr Masciangelo's opinion less than controlling weight.

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports her conclusion that Plaintiff is not disabled, the court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>28th</u> day of January, 2016.

U.S. MAGISTRATE JUDGE